**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

**MINERVA MENDEZ-RODRIGUEZ,**

    Plaintiff,

    v.

**COMMISSIONER OF SOCIAL SECURITY**,

    Defendant.

Civil No. 18-1782 (BJM)

**OPINION AND ORDER**

Minerva Mendez-Rodriguez ("Mendez") seeks review of the Social Security Administration Commissioner's (the "Commissioner's") finding that she is not disabled and thus not entitled to disability benefits under the Social Security Act (the "Act"). 42 U.S.C. § 423. Mendez contends the Commissioner's decision should be reversed because the administrative law judge ("ALJ") inaccurately characterized Mendez's functional limitations and failed to appropriately consider medical evidence. Dkt. No. 22. The Commissioner opposed. Dkt. No. 25. This case is before me on consent of the parties. Dkt. Nos. 5, 7. For the reasons set forth below, the Commissioner's decision is **AFFIRMED.**

**STANDARD OF REVIEW**

After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and her delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro* v. *Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, but not when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen* v. *Chater*, 172 F.3d 31, 35 (1st Cir. 1999). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Visiting Nurse*

*Ass'n Gregoria Auffant, Inc.* v. *Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (quoting *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971)). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodriguez Pagan* v. *Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner must employ a five-step sequential analysis and consider all the record evidence. 20 C.F.R. §§ 404.1520, 404.1520(a)(3); *Bowen* v. *Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote* v. *Sec'y of Health & Human Servs.*, 690 F.2d 5, 6–7 (1st Cir. 1982). Under this sequential analysis, the Commissioner first determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). Second, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. *Id.* § 404.1520(c). If not, the disability claim is denied. Third, the Commissioner decides whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. *Id.* §§ 404.1520(d), 404, subpt. P App'x 1. If the claimant's impairment meets or equals one of the listed impairments, she is conclusively presumed to be disabled. If not, the evaluation proceeds to step four.

At step four, the ALJ assesses the claimant's residual functional capacity ("RFC"), which is the individual's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments, and then determines whether those impairments prevent the claimant from doing the work she previously performed. *Id.* §§ 404.1520(e), 404.1545(a)(1). If the claimant can perform her previous work, she is not disabled. *Id.* § 404.1520(e). If she cannot, the fifth and final step asks whether the claimant can perform other work available in the national economy in light of her RFC, age, education, and work experience. If she cannot, then she is entitled to disability benefits. *Id.* § 404.1520(f). The claimant has the burden of proof at steps one through four. *Santiago* v. *Sec'y of Health & Human Servs.*, 944 F.2d 1, 5 (1st Cir. 1991). If the claimant has met that burden, the Commissioner has the burden at step five. *Ortiz* v. *Sec'y of Health & Human Servs.*, 890 F.2d 520, 524 (1st Cir. 1989).

## BACKGROUND

Mendez was born in Ponce, Puerto Rico on June 13, 1953. Social Security Transcript ("Tr.") 333, 335. She graduated from high school and worked as a department store employee for thirteen years before becoming a receptionist for eleven years. Tr. 237. By December 9, 2008, Mendez had stopped working after developing dextroscoliosis and emotional conditions, including depression and anxiety. Tr. 236.

On January 30, 2013, Mendez filed for disability insurance benefits ("DIB"). Tr. 233. She claimed an onset date of December 9, 2008, and she met the insured status requirements of the Act through December 31, 2013. Tr. 33, 233. Mendez's application for disability benefits was denied both initially and on reconsideration. Tr. 31. She requested a hearing before an ALJ, which occurred on August 22, 2016. Tr. 31. The ALJ heard testimony from Mendez, who was represented by counsel, and from Tania Shullo, a vocational expert. Tr. 31. He issued his decision on September 14, 2016, finding that Mendez was not under a disability during the relevant period. Tr. 42. Mendez appealed the ALJ's decision to the Appeals Council. Tr. 221. The Appeals Council denied Mendez's

request for review in September 2018, rendering the ALJ's decision the agency's final decision. Tr. 1–4.

*Physical Impairment*

The record contains evidence relating to Mendez's physical impairment. A report from Modern Radiology Diagnostic Imaging Centers, dated May 22, 2012, stated Mendez had mild dextroscoliosis based on the examination of a lumbar spine x-ray. Tr. 326. Fifteen sessions of treatment with oral and parenteral medication and physical measures did not resolve the issue. Tr. 363. MRIs taken on March 8, 2013 revealed disc herniation at L1-2 level on Mendez's lumbar spine and disc protrusion at C4-5 and C5-6 levels on her cervical spine. Tr. 328, 330, 363. A bone scan on July 10, 2013 revealed degenerative osteoarthritic changes at multiple bilateral joint groups and spinal levels. Tr. 337.

On August 6, 2013, Mendez had an appointment with Dr. Winston R. Ortiz ("Dr. Ortiz"). Tr. 363. At the appointment, Mendez stated she suffered from lower back pain radiating down both buttocks and neck pain radiating down both shoulders. Tr. 363. She also stated she took 10mg of Flexeril and 750mg of Relafin to treat this pain. Tr. 363. Dr. Ortiz found that Mendez could walk on her heels and toes and her motor system showed no signs of atrophy, involuntary movements, incoordination or loss of tone. Tr. 363–64. Her cranial nerves, reflexes, and sensory system were all normal. Tr. 363–64. Dr. Ortiz found Mendez "cannot perform jobs requiring heavy lifting and carrying, walking long distances, standing and sitting for prolonged periods and bending frequently." Tr. 364.

On January 8, 2014, Mendez had a CT scan of her abdomen and pelvis. Tr. 371. The scans were reviewed by Dr. Wanda Benitez ("Dr. Benitez"), who noted the presence of a sliding esophageal hiatal hernia, mild hepatomegaly, nephrolithiasis with hydronephrosis. Tr. 373. On August 20, 2015, Mendez had x-rays of her lumbosacral spine, cervical spine and lateral, and thoracic spine. Tr. 388–90. The lumbosacral spine x-ray revealed lumbar spine dextroscoliosis of approximately seven degrees with arthrosis of a facet joint, but no fractures. Tr. 388. The cervical spine x-ray revealed a suspected muscle

spasm with cervical spondylosis and possible intervertebral disc disease. Tr. 389. The thoracic spine x-ray revealed spondylosis with levoscoliosis of approximately eleven degrees. Tr. 390.

Two state agency medical consultants examined Mendez's medical records and function reports. The first medical consultant, Dr. Eileen Zayas ("Dr. Zayas"), stated on August 22, 2013 that Mendez could occasionally lift up to twenty pounds and frequently lift up to ten pounds. Tr. 120. Further, Dr. Zayas concluded Mendez could sit, stand, or walk for six hours out of an eight-hour workday. Tr. 120. Dr. Zayas stated Mendez's ailments could be reasonably expected to produce her pain and symptoms, but her statements about the intensity, persistence, and functionally limiting effects of the symptoms were not supported by the medical evidence. Tr. 119.

On May 19, 2014, Dr. Jeanette Maldonado ("Dr. Maldonado"), a state agency psychologist who reviewed Mendez's records, also mentioned physical limitations due to chronic pain. Tr. 140. A day later, a second state agency medical consultant, Dr. Rafael Queipo ("Dr. Queipo"), reviewed Mendez's records and found no evidence to support worsening . . . or changes" to Mendez's condition since the examination in August 2013. Tr. 138.

*Mental Impairment*

The record also contains evidence regarding Mendez's mental impairment. Dr. Daina I. Antonsanti reported that Mendez suffered from an unspecified anxiety disorder on June 28, 2012 and a major depressive episode on December 17, 2013. Tr. 392. On May 18, 2013, Mendez visited a psychiatrist, Dr. Hector L. Rodriguez ("Dr. Rodriguez"), who noted that Mendez said she felt sad and depressed after losing her job. Tr. 332. Mendez stated she "spent three years locked up in [her] room in [her] house," could not sleep, neglected her appearance and hygiene, was highly anxious and fearful, and spent most of her time in bed. Tr. 332. Dr. Rodriguez stated Mendez began psychiatric treatment in April 2012 at the

Ponce School of Medicine and took daily doses of 20 mg of Fluoxethene, 2 mg of Estazolam, and 75 mg of Doxepin, as well as 0.5 mg of Clonazepam twice daily. Tr. 332.

During the May 2013 examination, Dr. Rodriguez noted Mendez appeared "clean and neat," "casually dressed," and "well developed and nourished." Tr. 333. Mendez cooperated with the interview process and her speech was "spontaneous, productive, coherent, logical, and relevant." Tr. 333. Mendez exhibited no signs of obsession-compulsions, hallucinations, or delusions. Additionally, she demonstrated orientation regarding time, place, and person as well as the ability to recall words after five- and thirty-minute intervals. Tr. 334. However, Mendez appeared "sad, irritable and anxious," had a constricted affect, and voiced a fear of driving due to concerns she would be involved in a car crash. Tr. 333.

From July 20, 2013 through July 26, 2013, Mendez was hospitalized at Inspira Behavioral Care of Puerto Rico ("Inspira") due to her psychiatric problems. Tr. 99-110, 363. On July 23, 2013, Mendez was evaluated at Inspira. The doctor, whose name is illegible in the record, noted Mendez had suicidal ideas and a moderate risk of aggression. Tr. 100. Additionally, the doctor observed Mendez shaking, acting defensively, and speaking in a low voice. Tr. 100. Mendez also expressed despair and had a sad, dull affect. Tr. 100. Further, Mendez appeared depressed, anguished, anxious, confused, and tense. Tr. 100.

On July 24, 2013, an Inspira doctor evaluated Mendez and noted her suicidal ideas, deep sadness with frequent crying, anxiety, fear, irritability, a lack of tolerance for frustrations, and irritability. Tr. 102. Additionally, Mendez exhibited a lack of energy, poor concentration, poor attention, irrational thoughts, difficulty making decisions, visual and auditory hallucinations. Tr. 102. On the same day, an Inspira social worker also evaluated Mendez and noted her "thoughts of death." Tr. 105. From April 4 to April 9, 2014, Mendez was again hospitalized at Inspira. Tr. 108. Much of the records from that hospitalization

are illegible. Tr. 107-110. The records do note Mendez needed help managing her medication routine and her free time. Tr. 110.

A letter dated August 1, 2016 stated Mendez received care at the Ponce Health Sciences University ("PHSU") Wellness Center from June 2012 through June 2016. Tr. 111.

On June 19, 2013, a state agency psychologist, Dr. Hugo Roman Rivera ("Dr. Roman") reviewed Mendez's medical file. Dr. Roman stated that Mendez could perform simple and detailed tasks, persist at tasks for two-hour intervals with little interruption, interact with others, and adjust to changes. Tr. 123. He found that Mendez's ability to follow simple and complicated instructions was not significantly limited, but identified moderate limitations in concentration, adaptation to change, interaction with the general public, and ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms. Tr. 122-23. Dr. Roman found Mendez's statements regarding her cognitive defects and functional limitations to be "somewhat credible" but not to the degree Mendez described. Tr. 119. Dr. Roman further found Mendez had an intact thought process, adequate memory, and slightly diminished attention and concentration. Tr. 123. Additionally, after noting Mendez's history of depression, Dr. Roman found her to be "alert, active, and oriented." Tr. 123. Based on his findings, Dr. Roman found Mendez was not disabled. Tr. 124.

On May 19, 2014, a second state agency psychologist, Dr. Maldonado, reviewed Mendez's medical file. Tr. 140. Dr. Maldonado found mild limitations regarding daily life activities and social functioning. Tr. 135. She largely agreed with Dr. Roman's finding of moderate limitations, except she found no significant limitation in concentration. Tr. 139-140. She also noted that Mendez could perform simple and detailed tasks, persist at two-hour intervals with minimal interruptions, interact with others, and adjust to changes. Tr. 135, 140.

In her function reports, Mendez stated that she made meals daily, sometimes burned herself while cooking, and could no longer cook complete meals as in the past. Tr. 59, 66. However, she also reported that there had been no change in her cooking habits since the start of her illness and that she cooked more since the onset of her illness because it "distract[ed her] mind." Tr. 59-60. She also reported that she could not complete household chores "[b]ecause of the pain she feels in her back and other areas of her body." Tr. 67. Mendez also stated she lives in an apartment building where 90 percent of the population is elderly or people with disabilities, she needs her son's help with shopping, and she is unable to manage her finances due to her inability to concentrate. Dkt. No. 22 at 6, Tr. 67. Additionally, she described her ability to follow instructions as "regular" and attested that she fears driving. Tr. 61.

*The ALJ's Decision*

At step one, the ALJ found that Mendez met the insured status requirements of the Act through December 31, 2013, and that she had not engaged in substantial gainful activity since December 9, 2008. Tr. 31-33. At step two, the ALJ determined that Mendez suffered from the following severe impairments: "lumbosacral osteoarthritis; mild dextroscoliosis, lumbar; cervical and lumbar degenerative disc disease (DDD)." Tr. 33. However, he found her depression and anxiety to be non-severe after rating her functioning in four broad areas. Tr. 34. At step three, the ALJ concluded that Mendez "did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. Tr. 35. He then found Mendez capable of performing less than the full range of light work, as defined by 20 CFR § 404.1567(b). Tr. 36. Specifically, the ALJ found Mendez could lift or carry twenty pounds occasionally and ten pounds frequently; sit, stand, and/or walk six hours in an eight-hour workday; frequently climb ramps, stairs, ladders, ropes, or scaffolds; and occasionally kneel, stoop, crouch, and crawl. Tr. 36. He found Mendez capable of performing past relevant work. Tr. 41. Based on the record as a whole, the ALJ determined that Mendez "was not under a disability, as defined by the

Social Security Act, at any time from December 9, 2008, the alleged onset date, through December 31, 2013, the date last insured." Tr. 41.

## DISCUSSION

Mendez claims the ALJ erred in two ways. First, she claims the ALJ erred in finding her mental conditions non-severe by mischaracterizing her functional limitations and improperly weighing medical opinions. Second, Mendez asserts the ALJ failed to consider her non-severe mental impairments and related opinions in establishing her RFC. I will address each of these arguments below.

Mendez argues that the ALJ's conclusion that her mental conditions were not severe is not supported by substantial evidence. At step two of the sequential evaluation process, a claimant must demonstrate the existence of impairments that are "severe" from a vocational perspective, and that the impairments meet the durational requirement of the Act. 20 C.F.R. § 416.920(a)(4)(ii). The step two severity requirement imposes a de minimis burden, which is designed to screen out groundless claims. *McDonald v. Sec'y of HHS*, 795 F.2d 1118, 1123 (1st Cir. 1986). An impairment or combination of impairments is not severe when the medical evidence "establishes only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered." *Id.* at 1124 (quoting Social Security Ruling 85–28).

Under the regulations applicable at the time of the ALJ's decision, an assessment of a mental condition at step two required consideration of four broad functional areas (the "paragraph b" criteria): activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *See* 20 C.F.R. §§ 404.1520a (2014). The ALJ found mild limitation in activities of daily living, explaining that Mendez could prepare simple meals, perform household chores, and perform personal care independently. Tr. 34. Mendez faults this conclusion, contending that the ALJ overlooked the fact that she sometimes burns simple meals and needs her son's help to complete chores. In her function

reports, Mendez stated that she made meals daily, sometimes burned herself while cooking, and could no longer cook complete meals as in the past. Tr. 59, 66. However, she also reported that there had been no change in her cooking habits since the start of her illness and that she cooked more since the onset of her illness because it "distract[ed her] mind." Tr. 59-60. A mild limitation in activities of daily living is appropriate, even if Mendez is sometimes burned when cooking. She also stated that she could not complete household chores "[b]ecause of the pain she feels in her back and other areas of her body . . . ." Tr. 67. Similarly, she stated that her son assists her with shopping by carrying her purchases and otherwise helping her. Tr. 67. This is consistent with the ALJ's finding that the limitations on Mendez's daily activities are mostly due to physical condition.

The ALJ also found mild limitations in social functioning because Mendez lived in an apartment alone, shopped in stores for food, and, although she did not socialize, she had no problems getting along with family, friends, neighbors, or others. Tr. 34. Mendez argues the ALJ did not appropriately consider her testimony regarding her social functioning capacity because he did not discuss her residence in an apartment building where "90 percent of the population are elderly or people with disabilities," her son's help with shopping, and her inability to manage her finances. Dkt. No. 22 at 6. Mendez cites to page 61 of the transcript to support the idea that she lives in a building of predominantly elderly or disabled people. That page contains no mention of the population of her apartment building. Even assuming that fact was established, it would not show that Mendez herself is disabled. It is also true, as Mendez contends, that the ALJ's social functioning analysis did not mention that Mendez's son helps her shop. But this makes no difference to his conclusions regarding social functioning, as he otherwise accurately summarized Mendez's daily habits, including by noting that Mendez leaves her house alone to attend medical appointments and drives on these occasions. Tr. 35.

The ALJ also found mild limitation with regard to concentration, persistence, and pace. He acknowledged that Mendez reported problems with completing tasks and

concentration but also noted that she could follow oral and written instructions, read the Bible to relieve stress, watched television, listened to the radio, drove, and could go out alone. Tr. 34. He also noted that at a psychiatric consultative examination, Mendez was oriented to time, place, and person; could recall three words after five- and thirty-minute intervals; had slightly diminished attention and concentration and no memory deficits. *Id.* Mendez contests a mild limitation in this functional area because, when asked whether she could follow oral or written instructions, Mendez responded, "regular."[1] Dkt. 22 at 6. Mendez asks me to find that this means she could not necessarily follow instructions without limitation. Merriam-Webster's dictionary defines "regular" as something "constituted, conducted, scheduled, or done in conformity with established or prescribed usages, rules, or discipline." *Regular*, Merriam-Webster, https://www.merriam-webster.com/dictionary/regular (last visited Jul. 22, 2020). The ability to follow instructions "in conformity with established or prescribed usages, rules, or discipline" implies the ability to follow instructions without limitations. Further, in June 2013, Dr. Roman found that Mendez's ability to follow simple and complicated instructions was not significantly limited and in May 2014 Dr. Maldonado agreed. Tr. 122, 139.

Additionally, Mendez argues her fear of driving is evidence of her inability to concentrate. Dkt. No. 22 at 7. But a fear of driving does not equal an inability to do so. *See Diaz v. Colvin*, 14-CV-13363-IT, 2016 WL 2992909, at *5 (D. Mass. Mar. 28, 2016) ("Though [appellant] notes that the record demonstrates her fear of driving, it does not suggest that this fear has limited her ability to drive."). And as the Commissioner accurately points out, the fact that Mendez can drive despite her fear supports a finding that she is capable of concentrating.

---

[1] Mendez's response was written in Spanish. *See* Tr. 252. "Regular" in Spanish translates to "even, regular"; "fair, quite good, neither bad nor good"; "middling, average"; or "moderate, medium or average, not particularly good." *Regular*, Cambridge Spanish-English, https://dictionary.cambridge.org/dictionary/spanish-english/regular (last visited Aug. 11, 2020).

Regarding her ability to manage her finances, Mendez explained that her ability had diminished due to her difficulty concentrating and worsening mood. Tr. 68. But during the May 2013 consultative examination, Dr. Rodriguez found Mendez's attention span was only slightly diminished. Tr. 334. In May 2014, Dr. Maldonado found it to be not significantly limited. Tr. 139. And both Dr. Roman and Dr. Maldonado found that Mendez is "able to perform simple and detailed tasks [and] persist at tasks for two hour intervals with minimal interruptions." 123, 140. Moreover, Dr. Rodriguez found that Mendez could manage her own finances. Tr. 334. Thus, I find no reason to disturb the ALJ's findings regarding concentration, persistence, and pace, or his assessment of the other functional areas.

Next, Mendez argues that the ALJ inappropriately weighed Dr. Rodriguez's mental evaluation. Dkt. No. 22 at 9. Mendez argues that, by according more weight to Dr. Rodriguez's evaluation, the ALJ wrongly based his decision on a one-time examination of a person who was not Mendez's treating doctor and thus violated the norms for evaluating medical evidence established by 20 C.F.R. § 404.1527. *Id.* Mendez argues that the opinions of two state agency psychologists should have carried greater weight because they had access to Dr. Rodriguez's report, as well as Mendez's complete medical history. *Id.*

Medical opinions must be weighed based on the examining relationship, treatment relationship (including the length, frequency, nature and extent), supportability, consistency, specialization, and any other relevant factors. 20 C.F.R. § 404.1527(c). Generally, the opinion of a doctor who examined the appellant will receive greater weight than that of a doctor who did not. *Id.* § 404.1527(c). Opinions supported by detailed evidence, or other information in the record additionally receive more weight. *Id.* Finally, the opinion of a specialist in the relevant field receives more weight than that of a general practitioner. *Id.*

Here, Dr. Rodriguez examined Mendez, while the two state agency psychologists, Dr. Roman and Dr. Maldonado, did not. All three doctors cited to evidence supported by

and consistent with the record, and their conclusions differed slightly. Dr. Rodriguez found that Mendez was "clean and neat" and able to meet her personal necessities. Tr. 333. He found her speech "spontaneous, productive, coherent, logical, and relevant," with "no evidence of loosening of association or thought derailment." *Id.* Although her mood was "sad, irritable and anxious," she exhibited no signs of obsession-compulsions, hallucinations, or delusions. *Id.* He found that she had no deficits in memory, unimpaired ability to calculate, unimpaired abstraction ability, fair social judgment, fair insight, and slightly diminished attention span and concentration. Tr. 334. She could also manage her own finances. *Id.* In contrast, Dr. Roman found moderate limitations in concentration, adaptation to change, interaction with the general public, and ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms. Tr. 122-23. Dr. Maldonado found similar moderate limitations, although she found no significant limitation in concentration. Tr. 139-140. I find no error in the ALJ's weighing of these differing opinions.

> "[T]he resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [the Secretary of Health and Human Services], not for the doctors or for the courts. We must uphold the Secretary's findings in this case if a reasonable mind, reviewing the record as a whole, could accept it as adequate to support his conclusion.

*Rodriguez v. Secretary of Health and Human Services*, 647 F.2d 218, 222 (1st Cir. 1981) (citations omitted). As was his duty under the Act, the ALJ weighed slightly differing opinions and credited that of Dr. Rodriguez. I detect no error in this process. Rather, because Dr. Rodriguez examined Mendez in-person, whereas the two other doctors reviewed nothing but the medical evidence, the ALJ's weighing of these opinions was appropriate under the Commissioner's regulations.

Mendez further argues the ALJ erred by failing to mention the opinions of Dr. Ramon Lugo Betron ("Dr. Betron") and Dr. Ortiz. Dkt. No. 42 at 9–10. "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and

severity of [an appellant's] impairment(s), including [their] symptoms, diagnosis and prognosis, what [they] can still do despite impairment(s), and [their] physical or mental restrictions." 20 C.F.R. § 404.1527. The Commissioner correctly argues that the evaluations from Dr. Betron and Dr. Ortiz do not meet the criteria for opinion evidence established by the regulations. Though Dr. Betron notes Mendez's major depressive disorder and her symptoms, he does not opine regarding their nature, severity, or related functional limitations. *See, e.g.*, Tr. 313. Likewise, regarding Mendez's mental health, Dr. Ortiz stated that "[Mendez] was alert and oriented to time, place, and person. Judgement [sic], memory, fund of information and calculations were normal. She was markedly depressed." Tr. 363. This short statement hardly amounts to a judgment about the nature and severity of an impairment, symptom, diagnosis, or abilities. To the extent it does, however, it suggests that Mendez was generally functional apart from her depressed mood. It thus does not conflict with the ALJ's assessment of Mendez's mental conditions.

Next, Mendez argues the ALJ failed to adequately consider her need for an anti-psychotic medication because "a reasonable mind could not conclude that a psychiatrist would prescribe an anti-psychotic drug to a patient without perceptual disturbances." Dkt. 22 at 10. To the contrary, evidence of a prescription is not tantamount to evidence of a severe impairment. "It may well be that, as medicated, the impairment has no effect at all on the claimant's ability to work. The plaintiff may not rely on speculation in order to carry his burden of proof at Step 2." *Parsons v. Astrue*, No. 1:08-cv-218-JAW, 2009 WL 166552, at *2 n.2 (D. Me. Jan. 23, 2009) aff'd, 2009 WL 361193. Moreover, the ALJ has no obligation "to expressly refer to each document in the record, piece-by-piece." *Rodriguez v. Sec'y of Health and Human Servs.*, No. 90-1039, 915 F.2d 1557, 1990 WL 152336, at *1 (1st Cir. 1990). Accordingly, I find the ALJ adequately considered Mendez's need for medication in his decision.

Based on my review of the medical evidence, I find this court cannot disturb the Commissioner's finding that Mendez's mental health conditions are not severe. Further, even assuming the ALJ erred in finding Mendez's mental condition not severe, any error was harmless because the ALJ considered Mendez's mental health limitations when determining her RFC. Tr. 36-41. Errors at step two are generally harmless if the ALJ continued the sequential analysis because of the presence of another severe impairment. *See Michael H. B. v. Berryhill*, CV 17-530WES, 2018 WL 4178255, at *4 (D.R.I. Aug. 6, 2018), *report and recommendation adopted*, CV 17-530 WES, 2018 WL 4146599 (D.R.I. Aug. 30, 2018); s*ee also* 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2) ("If you have more than one impairment. We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' as explained in §§ 404.1520(c), 404.1521, and 404.1523, when we assess your residual functional capacity."). Here, the ALJ adequately considered limitations imposed by Mendez's mental impairments at subsequent stages of the analysis, which would render even an assumed error at step two harmless.

Lastly, Mendez argues the ALJ did not consider portions of the mental RFCs prepared by two state agency psychologists, Dr. Roman and Dr. Maldonado, when he assessed Mendez's RFC. In assessing a claimant's RFC, an ALJ must consider the combined effect of all the claimant's medically determinable impairments, whether or not severe. *See* 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). As noted above, the ALJ found both severe and non-severe impairments at step two of the sequential analysis. Specifically, the ALJ determined that Mendez's non-severe impairments included depression and anxiety. He considered these non-severe impairments in his RFC determination, discussing Mendez's reported symptoms, the results of a consultative examination, historical psychiatric treatment, and relevant expert opinions. Tr. 36-41. Mendez nonetheless charges the ALJ with error at this step because he "did not assess the[] mental RFCs" prepared by Dr. Roman and Dr. Maldonado, who found certain moderate limitations. Dkt. 22 at 12-13.

This is inaccurate. The ALJ considered these opinions and expressly assigned them partial weight, as their findings of moderate limitations conflicted with the mild limitations found by Dr. Rodriguez at the consultative examination. Tr. 40. As explained above, the ALJ is responsible for resolving conflicts in the evidence and is thus not required to credit the moderate limitations found by these reviewers where, as here, other substantial evidence (the results of Dr. Rodriguez's examination), support the ALJ's conclusion. Moreover, both Dr. Roman and Dr. Maldonado proposed a flexible mental RFC, explaining that Mendez is "able to perform simple and detailed tasks, persist at tasks for two hour intervals with minimal interruptions, interact with others, and adjust to changes." 123, 140. These findings support the conclusion that any mental limitations will have no more than a minimal effect on Mendez's ability to perform her past job as an office secretary. I find that the ALJ appropriately considered Mendez's non-severe limitations in establishing her RFC, including by considering the mental RFCs prepared by Dr. Roman and Dr. Maldonado, and properly weighing the evidence.

## CONCLUSION

For the above reasons, the Commissioner's decision is **AFFIRMED**.

**IT IS SO ORDERED**.
In San Juan, Puerto Rico, this 11th day of August, 2020.

                                        **S/Bruce J. McGiverin**
                                        BRUCE J. MCGIVERIN
                                        United States Magistrate Judge